**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

VANCE SOLMAN,             :
     Plaintiff,          :        CIVIL CASE NO.
                     :        3:15-CV-1610 (JCH)
     v.               :
                     :
EDWARD CORL et al.,      :        MAY 23, 2018
     Defendants.     :
                     :

**RULING RE: MOTION FOR SUMMARY JUDGMENT (DOC. NO. 82)**

## I. INTRODUCTION

Plaintiff Vance Solman ("Solman") brings this action against Tom Morassini and

Captain Edward Corl (collectively, "defendants") alleging retaliation against him for

conduct protected by the First Amendment. Defendants have moved for summary

judgment on the grounds that Solman failed to exhaust his administrative remedies as

required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), and on the

merits. For the reasons that follow, defendants' Motion for Summary Judgment is

granted. (Doc. No. 82).

## II. FACTUAL BACKGROUND

### A.    Solman's Termination from his Job

On February 14, 2013, Solman began work as a probationary inmate worker in

the MacDougall-Walker upholstery shop, which is managed by Peter Casey ("Casey")

and supervised by Cettina Spaar ("Spaar") and Tom Morassini ("Morassini"). Defs.'

Local Rule 56(a)1 Statement ("Defs.' L.R. 56(a)1") (Doc. No. 82-25) at 2 ¶¶ 8, 11–12;

Pl.'s Local Rule 56(a)2 Statement ("Pl.'s L.R. 56(a)2") (Doc. No. 84) at 2–3 ¶¶ 8, 11–12.

Solman's probationary period was set to last from February 14, 2013 until May 15,

2013. Defs.' L.R. 56(a)1 at 2 ¶ 12; Pl.'s L.R. 56(a)2 at 3 ¶ 12. During the time Solman

worked at the upholstery shop, Spaar and Morassini were both responsible for evaluating inmate performance. Pl.'s L.R. 56(a)2 at 3 ¶ 12. Spaar began working at the upholstery shop in February 2013, and received on-the-job training from Morassini on how to be a shop supervisor until Morassini retired in August 2013. Pl.'s L.R. 56(a)2, Statement of Additional Facts ("Additional Facts") at 28 ¶ 87.

At the time of his probationary period, Solman was pursuing a civil action in federal court, Solman v. Manzi et al., No. 10-cv-729 (SRU), in which he claimed that five correction officers had violated his civil rights at Cheshire Correctional Institution. Defs.' L.R. 56(a)1 at 3 ¶ 18; Pl.'s L.R. 56(a)2 at 5 ¶ 18. Solman initially informed Morassini of the Manzi litigation and the possibility he would have to miss work on February 14, 2013. Pl.'s L.R. 56(a)2 at 5 ¶ 20. He also discussed his case with Spaar on an unspecified date. Pl.'s L.R. 56(a)2 at 5 ¶ 21.

Solman settled his lawsuit on April 5, 2013. Defs.' L.R. 56(a)1 at 3 ¶ 22; Pl.'s L.R. 56(a)2 at 5 ¶ 22. However, at some point that same day, Captain Claudio, Solman's unit manager, had emailed Casey asking whether he had an issue with Solman not attending work from April 8, 2013 to April 11, 2013, because Solman planned to be on trial. Defs.' L.R. 56(a)1 at 3 ¶ 20; Pl.'s L.R. 56(a)2 at 5 ¶ 20. Around this time, Solman had also notified Morassini that he might be missing from work from April 8 to April 11 because he had a tentative trial date. Defs.' L.R. 56(a)1 at 3 ¶ 19; Pl.'s L.R. 56(a)2 at 5 ¶ 19.

On April 9, 2013, Casey emailed Captain Claudio stating that he had to send Solman back to his unit to settle unresolved issues and that his "excessive movement in and out of Industries is too disruptive and a security issue" and recommended Solman's

reclassification out of industries work.  Defs.' L.R. 56(a)1 at 3–4 ¶¶ 23, 25; Pl.'s L.R.

56(a)2 at 6–7 ¶¶ 23, 25.  Captain Claudio responded the same day that Solman had

reported that his case was over and that he could go back to work without interruptions.

Defs.' L.R. 56(a)1 at 4 ¶ 26; Pl.'s L.R. 56(a)2 at 7 ¶ 26.

On May 20, 2013, Spaar signed an Offender Work Performance &

Program/Removal Refusal Form ("Performance Evaluation") that rated Solman's

productivity as poor and his overall performance as fair.  Defs.' L.R. 56(a)1 at 4 ¶ 27;

Pl.'s L.R. 56(a)2, Ex. 10.  Solman testified that Morassini prepared the contents of the

Performance Evaluation.  Defs.' Ex. B, at 15.  Spaar and Morassini then extended

Solman's probation for an additional 60 days.  Pl.'s L.R. 56(a)2 at 8 ¶ 28.

Solman challenges the basis for the negative Performance Evaluation.  He

provides an email sent on April 9, 2013, in which Casey wrote that Solman "appears to

be a good worker, and has given staff and management no reason to deny him

reclassification back into Industries once he has resolved his matters."  Pl.'s L.R.

56(a)2, Ex. 6.  Solman also puts forward multiple positive performance evaluations for

his previous work in prison positions, Ex. 22 ¶¶ 4–5, Tab B.  Finally, he points to the

depositions of Casey and Maureen Berube-Allen, a corrections officer in Industries at

MacDougall-Walker, who both testified that it was not standard practice for supervisors

to require all inmates to check in their tools when one inmate left the shop during

working hours.  Pl.'s L.R. 56(a)2 at 6 ¶ 24, Ex. 19, at 53–56; Ex. 20, at 28–30.

On June 18, 2013, after approximately 28 days of Solman's extended probation,

Spaar, with input from Morassini, submitted a Performance Evaluation to Casey

recommending Solman's termination.  Defs.' L.R. 56(a)1 at 4 ¶¶ 30–31; Pl.'s L.R. 56(a)2

at 8–9 ¶¶ 30–31.  Morassini told Solman that he was being fired.  Pl.'s L.R. 56(a)2 at 8 ¶ 30.  That day, Casey approved the recommendation and sent an email to Captain Claudio requesting Solman's reclassification out of industries without prejudice.  Defs.' L.R. 56(a)1 at 5 ¶ 33; Pl.'s L.R. 56(a)2 at 9 ¶ 33.

On June 20, 2013, Solman submitted an Inmate Request to Casey in which he requested that he be restored to his job at the upholstery shop.  Pl.'s L.R. 56(a)2, Additional Facts at 29 ¶ 95; Pl.'s Ex. 13, at 58–60.  Solman attached his negative Performance Evaluations and wrote that he was never told how much work he was expected to complete and that he felt he did as much work as anyone else in the shop.  Pl.'s Ex. 13, at 58–60.  Casey never replied to Solman's Inmate Request.  Pl.'s L.R. 56(a)2, Additional Facts at 29 ¶ 95.  On July 17, 2013, Solman filed an inmate grievance requesting to be reinstated to his job and explaining that he had not been allowed to complete his extended probationary period.  Defs.' L.R. 56(a)1 at 5 ¶ 36; Pl.'s L.R. 56(a)2 at 10–11 ¶¶ 36–37.  He noted that Spaar had complemented his work performance several days before he was terminated.  Pl.'s Ex. 13, at 57.

B.  Solman's Guilty Plea and Loss of Visitation Rights

On December 23, 2013, Captain Edward Corl ("Captain Corl"), the Facility Investigator at MacDougall-Walker, ordered a shakedown of Solman's cell, where officers found a Nintendo game console and cartridge, a wedding band with small stones, Armani Exchange eyeglasses frames, and scented oils, which they believed were contraband.  Defs.' L.R. 56(a)1 at 5–6 ¶¶ 38, 40–41; Pl.'s L.R. 56(a)2 at 11–12 ¶¶ 38, 40–41.  Captain Corl and another officer escorted Solman to the Restrictive

Housing Unit ("RHU") pending investigation for the alleged contraband items.[1] Defs.' L.R. 56(a)1 at 6 ¶ 42; Pl.'s L.R. 56(a)2 at 12–13 ¶ 42. The escort was not recorded on video. Id. In a sworn statement, Solman provided that, in 18 years, he had never witnessed anyone being taken to segregation without a video recording, causing him to fear for his safety and believe that Captain Corl had placed him into segregation for an improper purpose. Compl. at ¶¶ 42–43; Pl.'s L.R. 56(a)2 at 12–13 ¶ 42.

During an interview with Captain Corl the day he was transferred to RHU, Solman acknowledged that the seized items were his, but denied that he received them during family visits. Defs.' L.R. 56(a)1 at 7 ¶ 44; Pl.'s L.R. 56(a)2 at 14 ¶ 44. On December 26, 2013, Captain Corl interviewed Solman again, this time with Lieutenant Paine. Defs.' L.R. 56(a)1 at 7 ¶ 45; Pl.'s L.R. 56(a)2 at 14 ¶ 45. Solman repeated that the items were not contraband. Defs.' L.R. 56(a)1 at 7 ¶ 46; Pl.'s L.R. 56(a)2 at 14 ¶ 46. He stated that he had bought the game cartridge from another inmate and did not know that the cartridge was contraband or that it had WiFi capabilities. Id. Solman also denied that his Nintendo DS Lite was able to connect to a wireless network. Pl.'s L.R. 56(a)2 at 14–15 ¶ 47.

Captain Corl told Solman that he would be issued a Class A Disciplinary Report due to the cartridge being a component of a wireless communication device. Defs.' L.R. 56(a)1 at 7 ¶ 48; Pl.'s L.R. 56(a)2 at 15 ¶ 48. Captain Corl informed Solman that, as a result of the Disciplinary Report, he would lose his family visiting privileges but, if he provided information about misconduct by correction officers, the warden would

---

[1] Captain Corl later returned the game console to Solman because it was not contraband. Defs.' L.R. 56(a)1 at 8 ¶ 51; Pl.'s L.R. 56(a)2 at 16 ¶ 51.

consider allowing Solman's wife to stay on noncontact visiting status.  Defs.' L.R. 56(a)1 at 8 ¶ 52; Pl.'s L.R. 56(a)2 at 16 ¶ 52.  Solman responded that he would plead guilty to the Disciplinary Report.  Defs.' L.R. 56(a)1 at 7 ¶ 49; Pl.'s L.R. 56(a)2 at 15 ¶ 49.

After Captain Corl issued the Disciplinary Report, Solman met with Correction Officer Rule on December 30, 2013, and pled guilty to the charges.  Defs.' L.R. 56(a)1 at 9 ¶¶ 56–57; Pl.'s L.R. 56(a)2 at 18 ¶¶ 56–57.  Solman pled guilty because he was threatened that his wife was going to be taken off his visiting list and also the visiting list of his son, who was not incarcerated at MacDougall-Walker and was not involved in the charges to which Solman pled guilty.  Defs.' L.R. 56(a)1 at 10 ¶ 58; Pl.'s L.R. 56(a)2 at 19 ¶ 58.  Corl told Solman that his game cartridge enabled his Nintendo DS Lite to connect to a wireless network even though Corl knew that was false.  Defs.' L.R. 56(a)1, Ex. V at 164, 176; Pl.'s L.R. 56(a)2 at 19 ¶ 58.

As a result of his guilty plea, Solman received seven days punitive segregation, 30 days loss of commissary, and 30 days loss of recreation, and also lost 10 Risk Reduction Earned Credits.  Defs.' L.R. 56(a)1 at 10 ¶ 60; Pl.'s L.R. 56(a)2 at 19 ¶ 60. Due to the Class A Disciplinary Report, Solman automatically lost the ability to participate in the Extended Family Visitation Program for two years and, due to Solman's overall classification score of four, he lost all contact visits for two years. Defs.' L.R. 56(a)1 at 10 ¶¶ 61–62; Pl.'s L.R. 56(a)2 at 19–20 ¶¶ 61–62.

On January 17, 2014, Solman submitted a letter to Warden Chapdelaine explaining that he had not possessed a component of a wireless communication device and that he had been coerced into pleading guilty to an offense he did not commit.  Pl.'s L.R. 56(a)2, Additional Facts at 31 ¶ 109.  Then, on January 29, 2014, Solman

submitted an inmate request to Captain Corl informing him that he had just learned that his wife and younger son had been removed from his visiting list and requesting an explanation.  Pl.'s L.R. 56(a)2, Additional Facts at 31 ¶ 111.  In response, on February 24, 2014, Captain Corl called Solman into his office and told him that his wife would be restored to his visiting list within 30 days.  Pl.'s L.R. 56(a)2, Additional Facts at 31 ¶ 112.  However, on April 13, 2014, Solman learned that his wife had not been restored to his visiting list and that she had been removed from the visiting list of his incarcerated son.  Pl.'s L.R. 56(a)2, Additional Facts at 31 ¶ 113.  The next day, Solman submitted another inmate request to Captain Corl requesting an explanation.  Id.  Captain Corl never responded to Solman's April 14, 2014 inmate request.  Pl.'s L.R. 56(a)2, Additional Facts at 31 ¶ 114.

In July 2014, Solman submitted a complaint directly to Commissioner Dzurenda, which the Commissioner's office received on August 6, 2014.  Defs.' L.R. 56(a)1 at 12 ¶ 70; Pl.'s L.R. 56(a)2 at 23 ¶ 70.  On August 12, 2014, Deputy Commissioner Semple responded to Solman and told him to first exhaust the chain of command with the District Administrator's Office and, if his issues were not resolved, to pursue the formal process set forth in Administrative Directive ("A.D.") 9.6, Inmate Administrative Remedies.  Defs.' L.R. 56(a)1 at 12 ¶ 71; Pl.'s L.R. 56(a)2 at 23 ¶ 71.  Solman submitted his complaint and supporting documents to District Administrator Quiro on August 26, 2014.  Id.  Subsequently, Solman and his wife contacted the District Administrator multiple times to inquire whether he would take action on the complaint.  Pl.'s L.R. 56(a)2 at 23 ¶ 71.

On December 12, 2014, after several months without a response to his letter or his and his wife's other efforts to contact District Administrator Quiro, Solman filed a formal grievance. Defs.' 56(a)1 at 12 ¶ 71; Pl.'s L.R. 56(a)2 at 23 ¶ 71. The grievance stated that Solman's wife and younger son were removed from Solman's visiting list, that his wife was removed from the visiting list of his older son, who was incarcerated at a different facility, and that Solman had been coerced into pleading guilty by the threat of his wife being removed from his and his son's visiting lists. Defs.' 56(a)1 at 11 ¶ 67–68; Pl.'s L.R. 56(a)2 at 22 ¶ 67–68; Defs.' Ex. N, at 2. On January 12, 2015, Warden Chapdelaine rejected Solman's grievance as untimely. Defs.' L.R. 56(a)1 at 12 ¶ 72; Pl.'s L.R. 56(a)2 at 24 ¶ 72. On January 14, 2015, Solman appealed the decision and, on January 28, 2015, the District Administrator rejected Solman's appeal. Defs.' L.R. 56(a)1 at 12 ¶ 73; Pl.'s L.R. 56(a)2 at 24 ¶ 73.

## III. LEGAL STANDARD

On a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that the party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wright v. N.Y. State Dep't of Corr., 831 F.3d 64, 71–72 (2d Cir. 2016). Once the moving party has met its burden, in order to defeat the motion, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 256, and present "such proof as would allow a reasonable juror to return a verdict in [its] favor," Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000). "An issue of fact is genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Cross Commerce Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir. 2016).

In assessing the record to determine whether there are disputed issues of material fact, the trial court must "resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought." LaFond v. Gen. Physics Servs. Corp., 50 F.3d 165, 175 (2d Cir. 1995). "Where it is clear that no rational finder of fact 'could find in favor of the nonmoving party because the evidence to support its case is so slight,' summary judgment should be granted." F.D.I.C. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (quoting Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994)). On the other hand, where "reasonable minds could differ as to the import of the evidence," the question must be left to the finder of fact. Cortes v. MTA N.Y. City Transit, 802 F.3d 226, 230 (2d Cir. 2015) (quoting R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997)).

**IV. DISCUSSION**

    A.    <u>PLRA Exhaustion</u>

The defendants argue that Solman failed to exhaust his administrative remedies as to his First Amendment retaliation claims against Morassini and Captain Corl. <u>See generally</u> Mem. in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Mem.") (Doc. No. 82-1) at 13–20. Solman argues that he exhausted his available remedies for both claims. <u>See generally</u> Pl's Mem. in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Mem.") (Doc. No. 83) at 24–30.

The Prison Litigation Reform Act ("PLRA") requires inmates to exhaust "such administrative remedies as are available" before bringing any "action . . . with respect to prison conditions . . . ." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong,"

Porter v. Nussle, 534 U.S. 516, 532 (2002), regardless of whether the inmate may obtain the specific relief he desires through the administrative processes provided, see Booth v. Churner, 532 U.S. 731, 741 & n.6 (2001).

Furthermore, the PLRA requires "proper exhaustion," see Woodford v. Ngo, 548 U.S. 81, 93 (2006), including "procedural rules" defined by the particular prison grievance system, see id. at 95. "It follows . . . that '[t]he level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim,' because 'it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.'" Espinal v. Goord, 558 F.3d 119, 124 (2d Cir. 2009) (quoting Jones, 549 U.S. at 218). "[U]ntimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement." Ruggiero v. Cty. of Orange, 467 F.3d 170, 176 (2d Cir. 2006) (discussing Woodford, 548 U.S. at 83–84).

In Ross v. Blake, --- U.S. ---, 136 S. Ct. 1850 (2016), the Supreme Court rejected the adoption by lower courts of a judicially-created "special circumstances" exception to the exhaustion requirement. See 136 S. Ct. at 1857, 1862 ("Courts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement."). The Court concluded that the PLRA contains a single, "textual exception": that an inmate must only exhaust such remedies as are "available" to him. See id. at 1858. There are no exceptions to an inmate's obligation to exhaust available remedies, without regard to any "special circumstances." See id. at 1856. However, in Ross, the Supreme Court identified three circumstances in which "an administrative remedy, although officially on the books, is not capable of use to obtain relief," namely: (1) when

a procedure "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when "an administrative scheme [is] so opaque that it becomes, practically speaking, incapable of use," because "no ordinary prisoner can discern or navigate it"; or (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1859–60.

"Failure to exhaust administrative remedies is an affirmative defense under the PLRA . . . ." Williams v. Correction Officer Priatno, 829 F.3d 118, 122 (2d Cir. 2016) (citing, inter alia, Jones v. Bock, 549 U.S. 199, 216 (2007)). "The defendants have the burden of showing that there is no genuine issue of material fact as to exhaustion that would preclude summary judgment." Johnston v. Maha, 460 F. App'x 11, 15 (2d Cir. 2012) (summary order).

### 1. Exhaustion of First Amendment Retaliation Claim against Morassini

The defendants argue that Solman did not exhaust his administrative remedies because he never filed a grievance asserting that he lost his job in the upholstery shop in retaliation for filing a federal lawsuit. See Defs.' Mem. at 17. Solman argues that he exhausted his administrative remedies by complying with the relevant rules and prison regulations. See Pl.'s Mem. at 25–28.

Administrative Directive ("A.D.") 9.6 of the State of Connecticut Department of Correction ("DOC") provides that "[t]he request for an administrative remedy and the action sought should be stated simply and coherently." Defs.' Ex. O, §5.E.3. On the Inmate Administrative Remedy Form, the first line of Section 2, "Other Requirements for Using the Inmate Administrative Remedy Procedure," states: "Read and comply with the instructions below, then complete Section 4 (State the Problem) on the reverse side."

11

Defs.' Ex. L, at 1.  On the reverse side of the form, Section 4, "State the Problem and Requested Resolution," instructs inmates to "[p]rovide any factual information that is applicable, including any responses from staff.  State the action that you think should be taken to resolve the problem."  Id at 2.

Solman's grievance described an allegedly unjustified termination, but did not describe misconduct that would have alerted prison officials to the existence of retaliation.  See Gonzalez v. Coburn, No. 6:16-cv-06174-MAT, 2017 WL 6512859, at *6 (W.D.N.Y. Dec. 20, 2017) (holding that plaintiff did not exhaust his retaliation claim where he did not allege any facts suggesting that corrections officers acted for retaliatory reasons); Brown v. Austin, No. 05 Civ. 9443 (PKC), 2009 WL 613316, at *5 (S.D.N.Y. Mar. 4, 2009) (finding that, although plaintiff's excessive force claim was exhausted, his retaliation claim was not exhausted because his grievance did not place the prison on notice of allegedly retaliatory conduct or provide necessary information to investigate his complaints).  Solman stated only that he was terminated from the upholstery shop and that he wanted to be "reinstated back to my job."  Defs.' Ex. L at 2. He explained that, although his probation period was extended and his supervisor, Spaar, had told him that his performance had improved, he was given a negative evaluation and terminated before completing the second probation period.  Id.  Absent facts relating to retaliation—such as Solman's civil litigation or the comments his supervisors made regarding his absences due to that litigation—there was no information in Solman's grievance that could have alerted the DOC to the alleged misconduct that now underlies his claim in federal court.  See Johnson v. Testman, 380 F.3d 691, 697 (2d Cir. 2004) ("In order to exhaust, therefore, inmates must provide

enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures.")

Solman argues that he fully complied with A.D. 9.6, which provides only that "[t]he request for an administrative remedy and the action sought should be stated simply and coherently."  See Pl.'s Mem. at 26.  He argues that inmates are not required to articulate legal theories or set forth the motive of prison officials.  See id. at 27.  In support, he cites <u>Espinal</u>, where the Second Circuit found that the plaintiff "did not have to assert the existence of a conspiracy to exhaust his conspiracy claim; it is sufficient that his grievance adequately described the alleged misconduct."  Id. at 127–28.  However, Solman's failure to exhaust his retaliation claim stems not from the lack of a legal theory, but from the absence of allegations that could "alert the prison to the nature of the wrong for which redress was sought."  <u>Espinal</u>, 558 F.3d at 127 (quoting <u>Johnson</u>, 380 F.3d at 697).  The lack of a description of the alleged misconduct that forms the basis for his present Complaint limited the ability of the DOC to undertake the appropriate level of inquiry internally.  See <u>Brownell v. Krom</u>, 446 F.3d 305, 311 (2d Cir. 2006) (holding that plaintiff failed to exhaust his administrative remedies where, without allegations of misconduct by corrections officers, his claim did not "trigger the level of investigation that a grievance suggesting retaliation would trigger.")

Solman also argues that the fact that the DOC responded to his grievance on the merits and denied his request confirms that he exhausted his administrative remedies.  See Pl.'s Mem. at 28.  However, the DOC's response shows only that Solman exhausted the claim in his grievance: that he was terminated from his position in the upholstery shop before he completed his extended probation.  See Defs.' Ex. L, at 2.

The DOC did not respond to a claim of retaliation because Solman had not alleged information suggesting retaliatory conduct.  See id.

Finally, Solman argues that there is a triable issue of fact as to whether, based on the response from the DOC in which the box stating "You have exhausted DOC's Administrative Remedies" was checked, he was justified in believing that he had exhausted his administrative remedies.  See Pl.'s Mem. at 28 n.10.  In support of his argument, Solman cites Braham v. Perelmuter, No. 3:15-CV-1094, 2017 WL 3222532, at *10 (D. Conn. July 28, 2017), in which this court found that a similar response from the DOC raised an issue of fact as to whether the plaintiff was justified in believing that he had exhausted his administrative remedies.  However, in Braham, a prison official returned the plaintiff's request without a disposition and, after seeing the box indicating that he had exhausted his claim, the plaintiff did not resubmit his grievance or file an appeal.  Id.  Thus, the checked box may have misled the plaintiff into failing to exhaust a claim that he had initiated, but was never acted upon.  See Ross, 136 S. Ct. at 1860 (holding that an administrative procedure is unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation").  Here, unlike in Braham, there is no issue of material fact as to whether the checked box deluded Solman into believing that he had exhausted the claim in his grievance even though there remained steps for him to perform; Solman did in fact exhaust the remedies for his claim in his grievance, but that claim was not one of retaliation.

Solman also cites Espinal, in which the Second Circuit found that the plaintiff had exhausted his claims against a defendant who allegedly denied him medical care even

14

though his grievance had not mentioned misconduct by medical personnel that he later alleged in his complaint in federal court. See Espinal, 558 F.3d at 128. Despite the lack of a description of inadequate medical care in the plaintiff's grievance, the prison superintendent denied Espinal's grievance in part because Espinal "was not refused medical attention, [but] rather [himself] . . . refused medical assistance." Id. The Second Circuit determined that this response indicated that prison officials had considered allegations about medical treatment in their investigation. Id. Consequently, the Second Circuit found that the purpose of exhaustion had been served because the prison had investigated the claims of misconduct by medical personnel.

In the instant case, the response to Solman's grievance stated only that he had exhausted his administrative remedies and that he did not have an entitlement to a position in the upholstery shop. See Pl.'s Mem. at 28. Based on depositions of Casey, Spaar, and Morassini in which none of the three upholstery shop supervisors recalled learning of Solman's grievance or speaking with anyone about Solman after his termination, Solman acknowledges that there is no evidence that the DOC conducted an investigation in response to his grievance before it was denied. See Pl.'s L.R. 56(a)2, Additional Facts at 29 ¶¶ 95–96. Thus, unlike in Espinal, where prison officials could not argue that the plaintiff had failed to exhaust his claim of denial of medical care when prison officials had investigated that very claim, Solman has not put forth evidence that the DOC investigated whether there was retaliation against him. See id.

The court concludes that the defendants have carried their burden of showing that there is no genuine issue of material fact as to whether Solman exhausted his claim that he was terminated from his position in the upholstery shop in retaliation for pursuing

the <u>Manzi</u> litigation. Defendants' Motion for Summary Judgment on Solman's First Amendment retaliation claim against Morassini is granted.

### 2. Exhaustion of First Amendment Retaliation Claim against Captain Corl

The defendants argue that Solman's grievance, which he filed nearly a year after the conduct he complained of occurred, was untimely. <u>See</u> Defs.' Mem. at 19. The defendants also argue that Solman did not exhaust his First Amendment retaliation claim against Captain Corl because, in addition to his grievance being untimely, it did not describe the retaliatory conduct he now challenges in federal court. <u>See</u> <u>id.</u> at 20. Solman responds that he did not have an available administrative remedy to grieve his coerced guilty plea and the resulting loss of visitation rights. <u>See</u> Pl.'s Mem. at 28. In support of his argument, he points to the regulations governing challenges to disciplinary actions and visitation rights, which state that "[d]isciplinary action resulting from a guilty plea shall not be subject to an appeal" and that only a visitor, not an inmate, can appeal removal from an inmate's visiting list. <u>See</u> <u>id.</u> at 29. He also puts forth evidence that he was consistently thwarted from taking advantage of the grievance process. <u>See</u> <u>id.</u> at 29–30.

The court concludes that an administrative remedy was available to Solman to exhaust his claim that Captain Corl coerced him into pleading guilty to possessing contraband and prevented his wife from visiting him in prison in retaliation for Solman's refusal to act as a confidential informant. Solman's claim of retaliation is distinct from his challenge to his disciplinary proceedings or the removal of his wife and son from his visiting list. <u>See</u> <u>Smith v. Ashley</u>, 9:15-CV-496 (BKS/ATB), 2016 WL 8732642, at *8 (N.D.N.Y. Apr. 1, 2016) (finding that plaintiff's appeal of his disciplinary proceeding did

not exhaust his administrative remedies as to his retaliation claim under New York State DOCS regulations). Under A.D. 9.6, "[t]he Inmate Grievance Procedure provides an administrative remedy for all matters subject to the Commissioner's authority that are not specifically identified in Sections 4(B) through 4(I) of this Directive." Def.'s Ex. O, p. 405, A.D. 9.6 § 4(A). While an appeal of a disciplinary action is listed at 4(E), courts have found that inmates must exhaust retaliation claims outside of their disciplinary appeal. See Davis v. Jackson, No. 15-CV-5359 (KMK), 2016 WL 5720811, at *7 (S.D.N.Y. Sept. 30, 2016) (noting that filing an administrative appeal from an underlying disciplinary proceeding was "an inappropriate means of exhaustion for Plaintiff's retaliation claims"). Thus, Solman was required to grieve his retaliation claim through the administrative process regardless of the availability of disciplinary appeals following a guilty plea. Similarly, the requirement that only a visitor could challenge his removal from an inmate's visiting list did not obviate the need for Solman to exhaust his retaliation claim.

Solman argues that, even if A.D. 9.6 provided an administrative remedy for his challenges to his guilty plea or his loss of visitation privileges, he was consistently "thwart[ed] from taking advantage of a grievance process" by prison officials. See Pl.'s Mem. at 29–30 (quoting Ross, 136 S. Ct. at 1860). However, Solman has not come forward with evidence that he sought to complain of retaliation in response to his refusal to act as a confidential informant. Rather, throughout the year between his guilty plea and the resulting sanctions on December 30, 2013, and his grievance on December 12, 2014, Solman only attempted to challenge the removal of his wife and son from his visiting list. Pl.'s L.R. 56(a)2 at 24–25 ¶¶ 67–75. There is no evidence that he was

thwarted from grieving <u>retaliation</u>. Ultimately, even if it had not been untimely, the grievance Solman filed in December 2014, did not describe retaliation for Solman's refusal to serve as an informant and therefore would not have exhausted his administrative remedy for his retaliation claim. <u>See</u>, <u>supra</u>, 12–13.

The cause of Solman's failure to exhaust his administrative remedies for his retaliation claim is thus distinguishable from the cases he cites where courts found that an administrative remedy can be rendered unavailable "if prison officials . . . inaccurately describe the steps he needs to take to pursue it." Pl.'s Mem. at 30 (quoting <u>Pavey v. Conley</u>, 663 F.3d 899, 906 (7th Cir. 2011)). In <u>Davis v. Fernandez</u>, 798 F.3d 290, 296 (5th Cir. 2015), jail staff told the plaintiff that he did not have the option to appeal and, as a result, he did not file an appeal, leaving his claim unexhausted. In <u>Carter v. Revine</u>, No. 3:14-CV-01553, 2017 WL 2111594, at *13–14 (D. Conn. May 15, 2017), a prison official told the plaintiff that he needed to mail his grievance and receive a receipt before following up on a pending grievance, even though the applicable prison directive stated that a grievance was to be placed in a box and a receipt was not required in order to follow up. <u>See</u> <u>id.</u> In contrast, Solman was never told that he could not file a grievance for Captain Corl's alleged retaliatory conduct. <u>See</u> <u>Angulo v. Nassau Cty.</u>, 89 F. Supp. 3d 541, 552 (E.D.N.Y. 2015) (finding that there was no evidence the plaintiff was told he could not file or appeal any grievance, or that his complaint involved non-grievable matters).

In addition, the delay of nearly a year between Solman's allegedly coerced guilty plea on December 30, 2013, and his formal grievance on December 12, 2014, is only partly attributable to the communications by Captain Corl and Deputy Commissioner

Semple that Solman provides as evidence that he was thwarted from grieving his claim. See Pl.'s Mem. at 30. Under A.D. 9.6, a "grievance must be filed within 30 calendar days of the occurrence or discovery of the cause of the grievance." Defs.' Ex. O, § 6.C. Assuming that the 30-day period for Solman to file a grievance began on April 13, 2014, when Solman learned that Captain Corl had failed to deliver on his promise to restore Solman's wife and son to his visiting list, eight months passed before Solman filed a formal grievance. Pl.'s L.R. 56(a)2, at 22 ¶ 67; Pl.'s L.R. 56(a)2, Additional Facts, at 31 at ¶ 113. By August 12, 2014, when Deputy Commissioner Semple instructed Solman to use the chain of command at his facility, it had been four months since Solman had learned that his family members remained unable to visit him and another four months would pass before Solman filed a grievance on December 12, 2014. Pl.'s L.R. 56(a)2, at 22, 23–24 ¶¶ 67, 71; Pl.'s L.R. 56(a)2, Additional Facts, at 31 at ¶ 113. Thus, Solman has not raised a question of material fact as to whether Captain Corl or Deputy Commissioner Semple rendered an administrative remedy unavailable by thwarting Solman's efforts to file a grievance. See Ross, 136 S. Ct. at 1860.

Finally, Solman argues that the procedure for obtaining a remedy was "so opaque that it becomes, practically speaking, incapable of use" because an "ordinary prisoner can[not] discern or navigate it [or] make sense of what it demands." Pl.'s Mem. at 30 n.11 (quoting Ross, 136 S. Ct. at 1859). However, as discussed above, the procedure for appealing a disciplinary report and the loss of visiting privileges did not render the procedure for alleging retaliation or misconduct related to the disciplinary process incapable of use. See, supra, 16–17.

The court concludes that Solman has not raised a genuine issue of material fact as to whether he exhausted his retaliation claim against Captain Corl.  Defendants' Motion for Summary Judgment as to Solman's First Amendment retaliation claims against Captain Corl is granted.

Because Solman has not created a genuine issue of material fact as to whether he exhausted his administrative remedies, the court does not reach the merits of his First Amendment retaliation claims.

## V.  CONCLUSION

Defendants' Motion for Summary Judgment (Doc. No. 82) is granted.

**SO ORDERED.**

Dated at New Haven, Connecticut this 23rd day of May, 2018.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge